## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

|  |  |
|---|---|
| In Re:<br><br>Erin Marie Clark,<br><br><div align="center">Debtor.</div> | <div align="right">Chapter 13<br>Case No. 22-31273 (WJF)</div> |

## NOTICE OF HEARING AND
## OBJECTION TO CONFIRMATION OF PLAN

TO:    The Debtor and other entities specified in Federal Rule of Bankruptcy Procedure 3015(f).

1.    The Debtor's residential landlord, Andrew J. Pulkrabek, ("Pulkrabek") hereby gives notice of a hearing and objects to the confirmation of the Chapter 13 Modified Plan ("Plan") [ECF 21] proposed by the Debtor.

2.    The objection to confirmation of the Plan will be heard at the confirmation hearing on the Debtor's Plan, scheduled for November 22, 2022, at 10:30 a.m., U.S. Bankruptcy Court, U.S. Courthouse, Courtroom 2A, 2nd Floor, 316 North Robert Street, Saint Paul, Minnesota.

3.    This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and 1334, Federal Rule of Bankruptcy Procedure 5005, and Local Rule 1070-1. This proceeding is a core proceeding. The petition commencing this Chapter 13 case was filed on August 10, 2022. The case is now pending in this Court.

4.    This objection arises under 11 U.S.C. § 365(b)(1)(A), Federal Rule of Bankruptcy Procedure 3015(f), and Local Rule 3015-1(e). This motion is filed under Federal Rule of Bankruptcy Procedure 9014, and Local Rules 3015-1(e) and 9013-2. Pulkrabek requests the denial of confirmation of the Debtor's Plan.

5.    Pursuant to Local Rule 9013-2(c), Pulkrabek hereby gives notice that, if necessary, he may call himself, or the Debtor, as witnesses at the hearing hereof.

6.    Pulkrabek is the Debtor's residential landlord. A copy of the Debtor's residential lease agreement is attached hereto as **Exhibit A.**

7.     In connection with her residential lease agreement, the Debtor provided Pulkrabek with a $2,700.00 security deposit.

8.     The posting of the Debtor's security deposit with Pulkrabek created a secured position for Pulkrabek in the event of Debtor's failure to perform under the lease as governed under the applicable nonbankruptcy law.

9.     The Debtor's deposit with Pulkrabek serves as collateral for the secured position. Under 11 U.S.C. § 506 Pulkrabek holds a secured claim in the amount of the Debtor's deposit.

10.    As of the petition date, the Debtor was in arrears for unpaid rent and other charges recoverable under the residential lease agreement and Minnesota state law as follows:

| | |
|---|---|
| Due June 1 balance of rent $310.00 | $310.00 |
| Due June 1 $900 payment on balance of security deposit | $900.00 |
| Due July 1 rent $2,850.00; | $2,850.00 |
| and payment of security deposit $900.00 | $900.00 |
| July 1 late fee charge $24.80 for $310.00 past due June rent; | $24.80 |
| computed at .08 x $310 = $24.80; see LEASE p. 2 par. 4 | |
| Due August 1 rent $2,850.00; | $2,850.00 |
| and payment of security deposit $900.00 | $900.00 |
| Late fee on July rent at .08 x $2,850 = $228 | $228.00 |
| City of Burnsville Utility Billing 6/29/2022 through 7/28/2022 | |
| including $1.24 in penalty; see LEASE p. 2 par 7 $ 175.09 | $175.09 |
| | |
| **Total** | **$9,137.89** |

11.    On July 14, 2022, Pulkrabek filed a state court eviction case in Minnesota District Court as Dakota County Court File 19HA-CV-22-2298.

12.    The eviction Complaint is attached hereto as **Exhibit B**. The eviction was brought against the Debtor and a cotenant, Jalen Burns.

13.    On August 10, 2022, the state court eviction was automatically stayed by the Debtor's voluntary filing of a bankruptcy petition. [ECF 1; ECF 9].

14.    Because the Debtor filed under Chapter 13, the Debtor's petition also stayed the eviction against the cotenant under the codebtor stay provisions of 11 U.S.C. § 1301(a).

15.    On November 4, 2022, the Debtor filed her Modified Chapter 13 Plan. [ECF

21].

16.    The Debtor's Plan proposes to assume the Pulkrabek lease and cure the prepetition monetary defaults through nonstandard provisions. [ECF 21].

17.    The Debtor is presently current with her monthly rent obligation, but has had multiple post-petition monetary defaults, including the following:

     a.  The Debtor failed to timely pay her September 2022 rent in compliance with Page 1, Paragraph 2 of her lease agreement.
     b.  The Debtor failed to timely pay her October 2022 rent in compliance with Page 1, Paragraph 2 of her lease agreement.
     c.  The Debtor failed to timely pay her November 2022 rent in compliance with Page 1, Paragraph 2 of her lease agreement.

18.    Pulkrabek will seek relief from the automatic stay in the event of additional post-petition monetary defaults by the Debtor.

19.    The Debtor also has multiple post-petition nonmonetary defaults which constitute material breaches of the lease agreement and have not been cured, including the following:

     a.  The Debtor is permitting other people to live at leased premises in violation of Page 2, Paragraph 6 of her lease agreement.
     b.  The Debtor has failed to pay for the utilities for the leased premises in violation of Page 2, Paragraph 13 of her lease agreement.
     c.  The Debtor has failed to maintain the leased premises in a clean and sanitary manner in violation of Page 3, Paragraph 9 of her lease agreement.
     d.  The Debtor is keeping a pet at the leased premises in violation of Page 4, Paragraph 13 of her lease agreement.
     e.  The Debtor, or her guests, are smoking at the leased premises in violation of Page 9, Paragraph 41 of her lease agreement.

20.    Pulkrabek will seek relief from the automatic stay if these post-petition nonmonetary defaults are not immediately cured by the Debtor.

21.    On September 28, 2022, Pulkrabek filed a Proof of Claim detailing the prepetition status of the unrejected lease and providing the correct cure amount [exclusive of interest and the costs of the eviction] in accordance with the underlying agreement. [Proof of Claim 3].

22.    Pulkrabek will file a larger claim under 11 U.S.C. § 502(g)(1) if the lease is rejected.

23.     Pulkrabek may also file an Amended Claim, which will include the prepetition costs of the state court eviction action, and attorneys' fees due as permitted by the underlying agreement and state law. Minn. Stat. § 504B.291 subd. 1(a).

24.     **Objection to Confirmation**. Under 11 U.S.C. § 1324(a), Pulkrabek objects to confirmation of the Debtor's plan because it fails to comply with multiple provisions of Chapter 13 as detailed below.

25.     **Good Faith.** The Debtor's Plan is objected to on the basis that it is does not apply the income of a non-filing spouse, and thus not proposed in good faith and therefore fails to comply with 11 U.S.C. § 1325(a)(3), and (7).

26.     **Failure to Cure.** The Debtor's Plan is objected to on the basis that it is does not cure the debtor's lease agreement in accordance with 11 U.S.C. § 365(b)(1)(A) and therefore fails to comply with 11 U.S.C. § 1325(b)(7).

27.     **Prompt Cure**. The Debtor's Plan is objected to because it does not cure the existing arrears within a reasonable time and therefore fails to comply with 11 U.S.C. § 1325(a)(1) and 1322(b)(5).

28.     **Adequate Assurance.** The Debtor's Plan is objected to because the Debtor fails to provide adequate assurance of cure, and therefore fails to comply with 11 U.S.C. § 1325(a)(1), (6), and (7).

29.     Wherefore, Pulkrabek respectfully requests that the Court deny confirmation of the plan, and such other relief as may be just and equitable.

Respectfully submitted,

**WARNER LAW, LLC**

Dated: November 16, 2022          _/e/ George E. Warner, Jr._
George E. Warner, Jr. (#0222719)
120 South Sixth Street, Suite 1515
Minneapolis, Minnesota 55402-1817
Telephone (952) 922-7700

_Attorneys for Andrew J. Pulkrabek_

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| In Re:<br><br>Erin Marie Clark,<br><br>          Debtor. | Chapter 13<br>Case No. 22-31273 (WJF) |

## VERIFICATION OF ANDREW J. PULKRABEK

I, Andrew J. Pulkrabek, verify that I have read the foregoing Notice of Motion and Motion and do hereby certify and declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the facts set forth therein are true and correct to the best of my knowledge, information, and belief in accordance with Local Rule 9013-2(d).

Dated: November 16, 2022

_____
Andrew J. Pulkrabek

# EXHIBIT A

LEASE RENTAL AGREEMENT

In consideration of the agreements of the Tenant(s), known as **Erin Marie Clarke** and **Jalen Marie Burns**, the Owner/Agent/Management (hereafter "Manager") hereby rents them the dwelling located at **1500 Circle Drive, Burnsville, MN 55337**, commencing on **April 24, 2022,** until **May 1, 2024**. Tenant(s), in consideration of Managers permitting them to occupy the above premises hereby agrees to the following terms:

1. **TERM**.
    a) The term hereof shall **commence on** <u>April 24, 2022</u>;
    b) **Until** <u>May 1, 2024</u>;
    c) Option to renew in **yearly increments after April 1, 2023, and sixty (60) days before May 1, 2024.**

2. **TOTAL RENT.** Rent shall be **two thousand eight hundred fifty dollars ($2,850.00) per month** (hereafter "Total Rent") **payable in advance, upon the First (1st)** day of each calendar month to Manager by agreed upon bank direct deposit/payment/transfer or at such other place(s) Manager may designate. Any bank or related fees charged to Manager for any deposit/payment/transfer shall be paid by Tenant as Additional Rent. Prompt payment of Total Rent and related fees shall be Tenant's responsibility. Total Rent must be paid in full and no amount subtracted from it. The first month's Total Rent is to be paid when the Tenant signs this lease. Tenant may be required to pay other charges to Manager under the terms of this lease. These other charges are to be called "Additional Rent". Additional Rent charges can result when Manager must pay for any expenses which are the tenant's responsibilities under the terms of the lease. Late charges, attorney's fees, and any expenses related to the enforcement of this lease shall be classified as Additional Rent. Additional Rent is payable as Total Rent, together with the next monthly Total Rent due. If Tenant fails to pay Additional Rent on time, Manager shall have the same rights against Tenant as if it were a failure to pay Total Rent. Lease violation penalty fees shall be classified as "Additional Rent".

3. **SECURITY DEPOSIT**. At the commencement of this Agreement, Tenant shall provide Manager a rent security deposit in the amount of two thousand seven hundred dollars (<u>$2,700.00) as a first-half</u> of a total **Security Deposit of five thousand four hundred dollars ($5,400.00).** The <u>second half of the security deposit ($2,700.00)</u> shall be paid in equal installments of nine hundred dollars (<u>$900) per month, beginning with the rent payment for June 1, 2022, and proceed each month with the rent payment until the total Security Deposit of five thousand four hundred dollars ($5,400.00) has been paid.</u>

<u>Example of first five full months of lease payments:</u>

First half of security deposit, payable upon signing of lease:          $2,700
Pro rata rent for April 24 to April 30, 2022, payable before occupancy:     $665
Rent for May, 2022:                                                          $2,850
Rent for June 2022 plus 1/3 2nd half security deposit:           $3,750

| | |
|---|---|
| Rent for July 2022 plus 1/3 2nd half security deposit: | $3,750 |
| Rent for August 2022 plus 1/3 2nd half security deposit: | $3,750 |
| Rent for September: | $2,850 |

The Security Deposit shall secure the performance of the Tenant(s) obligations herein. Manager may, but shall not be obligated to, apply all or portions of said deposit on account of Tenant(s) obligations herein including, but not limited to, if Tenant is in default of this lease, attorney's fees, unpaid Total Rent, and/or any other outstanding charges such as any damage caused by a pet. Any balance remaining upon termination shall be returned to the Tenant. Tenant shall not have the right to apply security deposit in payment of any Total Rent. Security Deposits may be raised proportionally with Total Rent increases.

4. **LATE FEES**. In the event Total Rent is not received by the **first (1st)** of the month for which it is due, Tenant agrees to pay a late charge of **eight percent (8%) of rent (e.g., .08 X $2,850.00 = $228.00) or the maximum allowed by law, whichever is greatest**. Tenant agrees to further pay **actual costs plus a one hundred dollar ($100.00) service fee for each dishonored bank check or reversed deposit**. After the fifth (5th) day that Total Rent has not been paid, further legal action may be taken at Tenant(s) expense. Tenant acknowledges that untimely payments may adversely affect their credit rating. Unpaid late charges and/or attorney's fees shall be classified as "Additional Rent". This Additional Rent is payable as Total Rent, together with the next monthly Total Rent due. Additional Total Rent that remains unpaid shall constitute a breach of this lease. Tenant also understands that Late Fees shall be applicable if a dishonored bank check, bank error or reversal of deposit, and/or out-of-state non-local check prevents Manager from receiving Total Rent money on time.

5. **USE**. The premises shall be used as a residence by the undersigned Tenant(s) with no more than five (5) adults and for no other purpose without written consent of the Manager.

6. **GUESTS**. Occupancy by guests staying over **two (2)** weeks will be a violation of the Use provision. In the event any other people occupy and live in this rental, in any capacity, without Manager's written consent, it will constitute a breach of this lease and it is agreed that the Total Rent will be increased seven hundred dollars ($700.00) per Guest per month and the Manager, at his soul option, may terminate this lease.

7. **UTILITIES**. Tenant shall be responsible for the payment of all utilities (i.e. city water, city sewer, gas, electric, garbage, etcetera) and services for the entire premises. Failure to pay all utilities in a timely fashion as and when due by the providers will constitute a breach of this lease and the Manager, at his soul option, may terminate this lease.

8. **HOUSE RULES**. Tenant agrees to abide by any and all house rules, whether promulgated before or after the execution hereof, including but not limited to rules with

respect to noise, odors, disposal of refuse, pets, and parking. Tenant(s) agree to hire a residential garbage service provider for weekly trash and recycle collection. Tenant understands and agrees that all trash and recycle containers must be stored inside the garage when not out for collection.

9. **MAINTENANCE, REPAIRS, OR ALTERATIONS**. Tenant acknowledges that the premises are in good order and repair, unless otherwise indicated herein. Tenant(s) shall, at their own expense and at all times, maintain the premises in a clean and sanitary manner, including all equipment, appliances, furniture, and furnishings therein and shall surrender the same at termination hereof, in as good condition as received, normal wear and tear excepted. Once notice is given to vacate, Tenant agrees to keep the premises in "show condition". "Show condition" means as clean, orderly, and undamaged as when received. Upon vacating, Tenant shall deliver premises vacant and clean. In the event the premises are returned in condition poor enough to prevent Manager from re-renting to a qualified new tenant, Tenant shall be responsible for Total Rent lost as well as the cost of restoration of the rental to the condition it was at the commencement of this lease. Tenant shall be responsible for damages caused by their negligence and that of their family, invitees, and/or guests.

● **PAINT**. Tenant shall not paint, paper, or otherwise redecorate without the prior written consent of the Manager. All paints, materials and work plans must be approved in writing by Manager or his authorized agent. Tenant shall be responsible for paint spills cleanups or damages as a result of paint related work.

● **GROUNDS**. Manager shall be required to maintain any surrounding grounds including the trimming of lawns, trees, shrubbery. Tenant is responsible for snow and ice removal from front walkway, driveway, deck, and patio.

● **FURNISHINGS**. Tenant is renting the premises unfurnished.

● **BASEMENT AND GARAGE**. Any use of the basement or garage shall be at Tenant(s) own risk. Tenant agrees to be responsible for maintaining these areas properly, including using a dehumidifier in the basement to minimize moisture if needed.

● **WINDOWS AND WINDOW TREATMENTS**. Tenant is responsible for the cleaning and maintenance of the windows and the window treatments (e.g., blinds, curtains, drapes, etc.) on the premises. If any window(s), screen(s) or window treatment(s) become damaged or broken as a result or during the term of this tenancy, the Tenant will be responsible for the costs of any repair(s). Tenant agrees to not install any window unit air conditioners. No additional window treatments, blinds, shutters, or curtains are to be installed and affixed to the house without the prior written authorization of the Manager.

- **ADDITIONAL ITEMS**. Light bulbs shall have a wattage of no higher than sixty (60) watts. Should Tenant attach any fixtures, blinds, or any other objects to the real property by nails, screws, or glue, it is agreed that these objects will remain with the premises and may be subject to cost of removal at Manager's discretion. Tenant shall not install or authorize installation of any wiring on the premises, inside or out, which requires the drilling of holes into the dwelling, without Manager's written consent. In the event a requested serviceman is unable to gain access to premises for agreed and scheduled repairs, Tenant shall be responsible for a service charge of one hundred fifty dollars ($150.00) payable as Additional Rent (hereafter "Added Rent"). Tenant is responsible for minor repairs such as light switches, replacing light bulbs, changing furnace filter no less than four times per year with an appropriately sized 4-inch filter, maintaining the water softener full of appropriate softener salt at all times, and repairing doorknobs, broken windows, leaking faucets, minor toilet problems, etcetera. Repairs resulting in less than two hundred fifty dollars ($250.00) expense shall be deemed minor repairs and are the responsibility of the Tenant. Should Tenant neglect maintenance responsibilities, Manager or agent may assume them on Tenant's behalf and any expenses incurred by Manager in connection therewith shall be Added Rent, payable to Manager on demand.

10. **ORDINANCE AND STATUTES**. Tenant shall comply with all statutes, ordinances, and requirements of all municipal, state, and federal authorities now in force, or which may hereafter be in force, pertaining to the use of the premises.

11. **SPACE "AS IS"**. Tenant has inspected the premises. Tenant states that they are in good order and repair and takes premises "as is" of the first day of the term of this agreement.

12. **ASSIGNMENT AND SUBLETTING**. Tenant shall not assign this Agreement or sublet any portion of the premises including the garage and/or the basement.

13. **PETS**. No pets of any kind are allowed on or in the premises.

14. **PESTS**. Tenant agrees to be responsible for the extermination of any insect or wildlife pest infestation during or as a result of the tenant's occupancy. Tenant shall be responsible to immediately remedy any such infestation(s) as soon as any pest problem is observed.

15. **APPLIANCES**. The dwelling contains various appliances, such as stove, microwave oven, refrigerator, dishwasher, laundry machines, garbage disposal, central air conditioner, automatic garage door openers, water softener, etcetera. These appliances are included in the Total Rent and the use of them is allowed for the Tenant(s) convenience only. Manager provides a Home Service Plus® service plan for the Furnace, Water Heater, Range/Stove, Clothes Dryer, Clothes Washer, Dishwasher, and Air Conditioner, details of which will be provided to Tenant upon occupancy. Tenant otherwise shall assume responsibility for care, repairs, and maintenance, including keeping appropriate water softener salt at necessary levels in the water softener to maintain water softness. If appliances are equipped with manuals and or warranty papers, Tenant shall not lose or discard these documents and will be responsible for their return.

16. **BUSINESS USE**. Neither the premises or any part thereof shall be used at any time, during the term of this lease by the Tenant, for the purpose or carrying on any business, including retail, profession, or trade of any kind.

17. **AUTOS**. No auto repairs lasting more than two (2) hours may be performed on the premises nor on any city street adjacent to the property.

18. **PARKING**. Tenant(s) agrees not to park or store a motorhome, recreational vehicle, boat, a trailer of any type, or otherwise similar conveyance, on the premises without prior written consent of the Manager.

19. **RIGHT OF ENTRY**. In accordance with the applicable law, Manager or his agent may enter the dwelling, with a minimum 24-hour notice unless otherwise approved by the Tenant, at any reasonable time to inspect, improve, maintain, or repair the property, or other necessary work. Manager may enter during reasonable hours and for the purpose of inspecting the premises, making necessary or agreed repairs, decorations, alterations, or improvements, supplying necessary or agreed services, or exhibiting the dwelling unit to prospective or actual purchasers, mortgagees, prospective tenants, workmen, contractors, or insurance inspectors. Tenant agrees to secure and isolate any pets to allow for safe entry and to allow for the intended use in entering the premises. The management shall have authorization to show the premises at any and all reasonable times, regardless of whether the Tenant is present or not. However, in the event of an emergency constituting a danger to life, health, or property, the Manager may enter the property at any given time without the consent of or notice to the Tenant. Management shall have the right to enter the property at any given time upon the request for repairs.

20. **INDEMNIFICATION**. Manager shall not be liable for damage or injury to the Tenant, or any other person, or to any property, occurring on or related to the premises or any part thereof, unless such damage or injury is the proximate result of the gross negligence of the Manager. Tenant agrees to hold Manager harmless from any and all claims from damages, no matter how caused. Tenant acknowledges receipt of HUD lead paint disclosure information and or pamphlet.

21. **POSSESSION**. If Manager is unable to deliver possession of the premises at the commencement hereof, Manager shall not be liable for any damages caused thereby, nor shall this agreement be void or voidable, but Tenant shall not be liable for any Total Rent until possession is delivered. Tenant may terminate this Agreement if possession is not delivered within two (2) days of the commencement of the term hereof if being the fault of the Manager. In the event this Agreement is terminated by the Tenant and or the Manager, any monies or realty commissions paid by Tenant and or Manager shall be deemed damages against the party in default, not the real estate broker.

22. **DEPOSITED REFUNDS**. The balance of all deposit refunds shall be refunded within 21 days from the date possession of the property is delivered to Manager, together with a statement showing any changes made against such deposits by Manager. Tenant agrees to provide Manager with the address of their new residence and include it in a notice of intention to vacate letter.

23. **WAIVER**. No failure of Manager to enforce any term hereof shall be deemed a waiver, nor shall any acceptance or partial payment be deemed a waiver of Manager's rights to the full amount thereof. This lease supersedes any other lease on the premises during the term stated herein. No terms in this lease shall be deemed waived, regardless of any conflicting terms or rules in any governmental rent assistance programs.

24. **REAL ESTATE COMMISSION**. In the event a commission was earned by a real estate broker, or other agent, Tenant shall not take possession of the premises unless all fees due broker or agent are paid in full as agreed. Commission is payable when the lease is signed by the Tenant(s). It is solely for locating the rental for the Tenant and is not refundable under any circumstances regardless of any disputes between Manager and Tenant(s) before, after, or whether or not occupancy is taken.

25. **DEFAULT**. If Tenant shall fail to pay Total Rent when due or fail to perform any terms hereof (hereafter a "Default"), after not less than seven (7) days written notice of such Default given in a manner required by law, the Manager, at his option, may terminate all rights of the Tenant herein. If Tenant abandons or vacates the premises while in default, after legal process, Manager may consider any property left on the Premises to be abandoned and may dispose of the same in any manner allowed by law. If the lease is canceled or Total Rent or Additional Rent is not paid on time, or Tenant vacates the Premises, Manager may, in addition to other remedies, use eviction or other lawsuit method to take back the Premises. If the Lease is ended and Manager lawfully takes back the Premises, Total Rent and Additional Rent for the unexpired term becomes due and payable. Manager may at that point re-rent the Premises for any term. Manager is not obligated to rent the Premises under the same terms hereof. However, Tenant shall continue to be responsible for Total Rent, expenses, damages, and losses, in addition to the Manager's cost of repairs, decorations, broker's fees, attorneys' fees, advertising, and preparation for renting. Any rent received from the re-renting shall be applied to the reduction of money the Tenant owes. After a Default, Tenant shall be responsible for Manager's full cost of re-renting. Tenant agrees to waive rights to trial by jury in any matter which comes up between the parties under or because of this Lease. Manager has taken no action that would result in the Lease being subject to any right of set-off, abatement, counterclaim, or defense.

26. **ATTORNEYS FEES**. In any legal action to enforce the terms hereof or relating to the premises, regardless of the outcome, the Manager shall be entitled to all costs incurred in connection with such action, including reasonable attorney's fees. Tenant acknowledges all attorney's fees shall be classified and billed to Tenant as Added Rent.

27. **NOTICES**. Any notice which either party may or is required to give may be given by mailing same, by certified mail, to Tenant at the premises, or to Manager at the address shown below or at such other places as may be designated by the parties from time to time. This includes notification or request for repairs. Tenant is required to notify Manager in writing, using both certified mail and email, of **Intention to Vacate or Intention to Renew at least sixty (60) days before the expiration of this lease**. Tenant agrees to immediately notify Manager in writing by phone or email followed by certified mail of any dangerous or hazardous conditions existing on the premises.

28. **SHOW CONDITION.** Tenant agrees to cooperate with Manager in the showing of the premises for sale or rental and agrees to make premises accessible and in "show condition" once notice is given to vacate.

29. **INSURANCE.** Tenant is responsible for the liability/fire insurance coverage on premises. Tenant agrees to obtain and maintain a mandatory **"Renters Insurance"** policy and to **provide Manager with a copy of policy prior to occupancy of the premises**. In the event Tenant fails to provide Manager with a copy of a valid "Renters Insurance" policy as agreed, Manager may issue a Notice of Lease Violation to the Tenant and may obtain insurance on the Tenant's behalf at the Tenant's expense, which will be payable as Added Rent. In the event a written Notice of Lease Violation is issued to the Tenant, the Tenant shall correct the violation within five (5) days. If Tenant fails to correct the item(s) in violation, they will be responsible to pay a Lease Violation Penalty Fee no less than one hundred fifty dollars ($150) payable as Added Rent.

30. **SUCCESSORS**. This lease is binding on all parties who lawfully succeed to the rights or take the place of the Manager or Tenant.

31. **TENANCY AND SERVICE OF PROCESS**. Every Tenant who signs this Agreement agrees to be fully responsible jointly and severally for all items agreed herein and furthermore agrees to accept documents, service of summons, and other notices relative to the tenancy.

32. **TELEPHONE**. Tenant(s) agree to maintain a telephone in the dwelling during the term of this lease and to furnish Manager with the telephone number within five (5) days from taking occupancy. Tenant shall be responsible for any telephone company installation charges, if applicable.

33. **PLUMBING**. All drains, waste pipes, and plumbing are accepted as clear by the Tenant at the time of occupancy and any atypical material (e.g. toys, clothing, disinfecting wipes, diapers, etcetera) blocking them after occupancy shall be repaired by the Manager with Tenant paying all cost of repairs.

34. **LOCKOUTS**. Should Tenant(s) become locked out of their dwelling and unable to gain access through their own resources, they may call a professional locksmith or the Manager to let them in. Tenant will be responsible for damages if any. If any lock is changed or "re-keyed" it will be the responsibility of the Tenant to ensure all locks on the premises are re-keyed with the same key as well. Tenant shall be responsible for the cost of the locksmith and to provide the Manager with new keys if the locks are changed. If Manager is called upon to let Tenant(s) in, there will be a two hundred dollar **($200.00)** charge.

35. **CLEANING FEE**. In the event the premises are returned in condition poor enough to require a cleaning service, or in the case of an unauthorized pet residing at the premises during the term of this lease, a cleaning fee is to be paid by Tenant. This fee represents the actual cost of preparation for re-occupancy. Manager will waive this fee until premises are returned and if returned in as good condition as received at commencement of this lease.

36. **BANKRUPTCY**. If (1) Tenant assigns property for the benefit of creditors, (2) Tenant files a voluntary petition or an involuntary petition is filed against Tenant under any bankruptcy or insolvency law, or (3) a trustee or receiver of Tenant or Tenant's property is appointed, Manager may give Tenant thirty (30) days written notice of the cancellation of the term of this lease. If any of the above is not fully dismissed within the 30 days, the term shall end as of the date stated in the notice. Tenant must continue to pay Total Rent, damages, losses, and expenses without offset.

37. **WITHHOLDING TOTAL RENT**. Under no circumstances may any Total Rent be withheld in full or in part, regardless of any expenses incurred by Tenant, regardless of the financial status of the premises, or the legality of the premises. Total Rent must be paid to Manager. Non-payment or payment to any other party is a violation of this Lease Agreement and cause for immediate eviction.

38. **SMOKE DETECTORS, FIRE EXTINGUISHER**. Tenant acknowledges the premises is equipped with smoke detector(s) and fire extinguisher(s). Tenant agrees to test the smoke detectors on a regular basis (2 to 3 times per month) and report any problem with them immediately to Manager in writing. Tenant agrees to replace the batteries for the smoke detector(s) as necessary with a new battery at least once per year.

39. **VEHICLES**. Tenant(s) agree to keep no more than two (2) vehicles at the premises. These vehicles must always be operable and currently registered. Tenants agree to park vehicles in the garage and keep the garage and driveway free of oil or other automotive fluid drippings. Parking on the lawn of the premises or on the side of the garage constitutes a breach of this lease. Tenant agrees not to park boats, recreational vehicles, trailers, Campers, or any type of truck on the premises without Manager's written permission. Tenant agrees not to repair vehicles on the premises if such repairs will take longer than a single day unless vehicle is kept in the enclosed garage. Tenant is responsible for damages to the premises caused by Tenants vehicles or those of invitees or guests.

40. **FIREPLACE**. Fireplaces can be extremely dangerous. Tenant agrees to take all precautions and exercise safety measures when using a fireplace. Tenant agrees to assume responsibility for keeping the chimneys clear of any build up or obstructions during their tenancy. Tenant is responsible for any and all damage that may result in the use of a fireplace.

41. **NO SMOKING**. Tenant acknowledges that smoking of any kind is strictly prohibited in this rental.

42. **WATERBEDS**. Tenant shall not have a waterbed on the premises.

43. **BREACH OF LEASE**. In the event agreements made in this lease are broken by Tenant, the security deposit will be forfeit at Manager's sole discretion and option. Manager may continue to lease or terminate any or all the Tenant's rights herein. In the event a written Notice of Lease Violation is issued to the Tenant, the Tenant shall correct the violation within seven (7) days. If Tenant fails to correct item(s) in violation, they will be responsible to pay a Lease Violation Penalty Fee of no less than two hundred fifty dollars ($250.00) per month, per violation, payable as Added Rent.

44. **ABANDONMENT**. Tenant agrees to return the premises to the Manager according to the terms of this lease; clean, vacant, and undamaged. The premises will be deemed abandoned only under all the following conditions:

1.  The Tenant fails to respond to official notices from the Manager, agent, or local government offices delivered by the US Postal Service.
2.  The Tenant fails to respond to telephone contact and/or telephone and contact numbers are disconnected.
3.  The Tenant is at least ten (10) days past due on the Total Rent payment for the current month.
4.  Manager agent has made a physical inspection of the premises to verify occupancy by Tenant or the lack thereof.
5.  Manager has notified the Tenant in writing that the premises will be deemed abandoned within five (5) days unless Tenant responds to inform Manager that the premises have not been abandoned.

In the event the premises are deemed abandoned upon failure of Tenant's part to respond, the parties agree that the Manager may seize possession of the premises including the contents of the premises. It is furthermore agreed that the abandoned contents or personal property left by the Tenant may be disposed of at the Manager's discretion.

45. **ILLEGAL ACTIVITY AND CRIME-FREE/DRUG-FREE HOUSING**

In consideration of the execution of this lease for the dwelling unit identified herein, Tenant agrees as follows:

1.  Tenant, any members of the Tenant's household or a guest or other person under the Tenant's control shall not engage in illegal activity, including drug-related illegal activity, on or near the said premises. "Drug-related illegal activity" means the illegal manufacture, sale, distribution, purchase, use or possession with intent to manufacture, sell, distribute, or use of a controlled substance (as defined in Section 102 of the Controlled Substance Act [21 U.S.C. 802]) or possession of drug paraphernalia.
2.  Tenant, any member of the Tenant's household, or a guest, or other person under the Tenant's control shall not engage in any act intended to facilitate illegal activity, including drug-related illegal activity, on or near the said premises.

3. Tenant or members of the household will not permit the dwelling to be used for, or to facilitate, illegal activity, including drug-related illegal activity, regardless of whether the individual engaging in such activity is a member of the household.

4. Tenant or members of the household will not engage in the manufacture, sale, or distribution of illegal drugs at any locations, whether on or near the dwelling unit premises or otherwise.

5. Tenant, any member of the Tenant's household, or a guest or other person under the Tenant's control shall not engage in acts of violence or threats of violence, including but not limited to the unlawful discharge of firearms, prostitution, criminal street gang activity, intimidation, or any other breach of the Lease Rental Agreement (hereafter "Agreement") that otherwise jeopardizes the health, safety or welfare of the Manager.

VIOLATION OF THE ABOVE PROVISIONS SHALL BE A MATERIAL VIOLATION OF THE LEASE AND GOOD CAUSE FOR IMMEDIATE TERMINATION OF TENANCY.

A single violation of any of the provisions of paragraph 45 shall be deemed a serious violation and material non-compliance with this Agreement. It is understood and agreed that a single violation shall be good cause for termination of the lease. Unless otherwise provided by law, proof of violation shall not require criminal conviction, but shall be by the preponderance of the evidence as decided by the Manager.

46. **HOLDING OVER**. Any holding over by the Tenant, after the twelve (12) month obligation of the Tenant under the Term of this Lease, shall be construed as a tenancy at sufferance (unless such occupancy is with the written consent of the Manager) in which event the Tenant will be a tenant from month to month, upon the same terms and conditions of this Lease, except at a Total Rent rate for such holdover period of one hundred fifty percent (150%) of the Total Rent rate in effect for the month preceding such holdover. Acceptance by the Manager of Total Rent after such termination shall not constitute a renewal.

47. **OPTION TO RENEW LEASE**. Tenant has the option, providing the terms and conditions of this lease have been complied with and satisfied, to renew this Agreement, at an annual increase of no more than fifteen percent (15%) of the previous month's Total Rent. With such increase to be determined by the Manager. Any renewal is to be requested no less than sixty (60) days before the term of this agreement. If Tenant wishes to renew, a new lease will be prepared and a processing fee of one hundred dollars ($100.00) will be payable at the execution of the new lease.

48. **OPTION TO ADJUST TOTAL RENT**. Manager reserves the right to adjust Total Rent any time beginning in the thirteenth (13th) month of this lease. The maximum adjustment will be limited to no more than fifteen percent (15%) of the Total Rent stated in paragraph 2, herein.

49. **ENTIRE AGREEMENT**. The foregoing constitutes the entire agreement between the parties and may be modified only by an official Change of Terms Notice issued by the Manager in writing, or a writing signed by both parties

50. **SEVERABILITY** In case any one or more of the provisions contained in this Agreement shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provisions of this Agreement, but this Agreement shall be construed as if such invalid or illegal or unenforceable provision had never been contained herein. Upon such determination that any term or other provision is invalid, illegal or unenforceable, the court or other tribunal making such determination is authorized and instructed to modify this Agreement so as to effect the original intent of the parties as closely as possible so that the transactions and agreements contemplated herein are consummated as originally contemplated to the fullest extent possible.

51. **ACKNOWLEDGEMENT**. Tenants, indicated by their signatures below, hereby acknowledge they have read, understand, and agree to all parts of this document, and have received a copy.

--- THE REST OF PAGE INTENTIONALY LEFT BLANK ---

THE UNDERSIGNED HAVE EXECUTED THIS LEASE RENTAL AGREEMENT AS OF THE EFFECTIVE DATE BELOW AND ACKNOWLEDGE RECEIPT OF A COPY HEROF.


Date: <u>April 24, 2022</u>


**Manager**

<u>_[signature]_</u>
Signature

Andrew J. Pulkrabek
333 Washington Avenue North
Suite 300 - 9033
Minneapolis, MN 55401, USA

(612) 217-2331

ajpulkrabek@gmail.com


**Tenant(s)**


_____             _____
Signature                           Signature

<u>Erin Marie Clarke</u>             <u>Jalen Marie Burns</u>
Name                                Name


_____             _____
Social Security                     Social Security

<u>(763) 340-9984</u>               <u>(651) 333-5475</u>
Phone                               Phone

<u>erinc4@icloud.com</u>            <u>jalenburns03@gmail.com</u>
Email                               Email

THE UNDERSIGNED HAVE EXECUTED THIS LEASE RENTAL AGREEMENT AS OF THE
EFFECTIVE DATE BELOW AND ACKNOWLEDGE RECEIPT OF A COPY HEROF.

Date: April 24, 2022

**Manager**

Signature

Andrew J. Pulkrabek
333 Washington Avenue North
Suite 300 - 9033
Minneapolis, MN 55401, USA

(612) 217-2331

ajpulkrabek@gmail.com

**Tenant(s)**

Signature

Erin Marie Clarke
Name

Social Security

(763) 340-9984
Phone

erinc4@icloud.com
Email

Signature

Jalen Marie Burns
Name

Social Security

(651) 333-5475
Phone

jalenburns03@gmail.com
Email

## EXHIBIT B

19HA-CV-22-2298

Filed in District Court
State of Minnesota
7/14/2022 4:28 PM

**STATE OF MINNESOTA**                                    **DISTRICT COURT**

**COUNTY OF DAKOTA**                                   **FIRST JUDICIAL DISTRICT**

Andrew J. Pulkrabek,                                        CASE NO. _____

                        Plaintiff,

v.                                              **EVICTION ACTION COMPLAINT**

Erin Marie Clarke
Jalen Marie Burns
1500 Circle Drive
Burnsville, MN 55337,

                        Defendants.

Robin Ann Williams, Laurel J. Pugh, Kerri J. Nelson, or Peter B. Wagner, attorney for Plaintiff, states and declares as follows:

1)      Plaintiff leased or rented to Defendants, by a written agreement, the premises at 1500 Circle Drive, in the City of Burnsville, County of Dakota, the State of Minnesota, Zip Code 55337.

2)      The rent due and payable under this agreement each month is $2850.00, due on the first day of each month.

3)      The owner of the premises described above is Andrew J. Pulkrabek.

4)      Plaintiff/owner, having present right of possession of said property, has complied with M.S.A. 504B.181 by:

☒      a.      disclosing to tenants either in the rental agreement or otherwise in writing prior to commencement of tenancy the name and address of:

        1.      the person authorized to manage premises AND

        2.      the owner or agent authorized by owner to accept service of process and receive and give receipts for notice and demands AND

☐      b.      posting outside the management office a printed notice containing the above information; OR

☒      c.      the above information was known by tenants not less than 30 days before the filing of this action because it is in the lease.

19HA-CV-22-2298

Case 22-31273    Doc 23    Filed 11/17/22    Entered 11/17/22 13:55:09    Desc Main
Document       Page 23 of 33

Filed in District Court
State of Minnesota
7/14/2022 4:28 PM

5)    Plaintiff seeks to have the Defendants evicted for the following reasons:

☒    a.    Defendants are still in possession of the above premises and have failed to pay $2,850.00 for July 2022 rent, $900.00 for the July 2022 security deposit installment, and $24.80 for a June 2022 late fee, which was due with Defendants' payment of July 2022 rent. The total amount owed for July 2022 is $3,774.80. (In addition to the $3,774.80, Defendants also still owe $310.00 for June 2022 rent and $900.00 for their June 2022 security deposit installment.) In addition, Plaintiff demands payment of "costs of the action" pursuant to Minn. Stat. 504B.291.

This property is not governed by the CARES Act.

6)    Plaintiff seeks judgment against the above Defendants for recovery of said premises plus costs and disbursements herein.

7)    Defendants are not now in the military or naval service of the United States, to the best of Plaintiff's information and belief.

I declare under penalty of perjury that everything that I have stated in this document is true and correct. Minn. Stat. § 358.116.

Dated:  July 14, 2022                           ABRITER PLLC

Hennepin County, Minnesota                     By: /s/ Robin Ann Williams
County and State where signed                  Robin Ann Williams (#242664)
                                               Laurel J. Pugh (#330012)
                                               Kerri J. Nelson (#0386920)
                                               Peter B. Wagner (#0402864)
                                               333 Washington Avenue North, Suite 300
                                               Minneapolis, MN 55401
                                               612-208-2710
                                               rwilliams@abriterlaw.com
                                               lpugh@abriterlaw.com
                                               knelson@abriterlaw.com
                                               pwagner@abriterlaw.com
                                               *Attorneys for Plaintiff*

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| In Re:<br><br>Erin Marie Clark,<br><br>                     Debtor. | Chapter 13<br>Case No. 22-31273 (WJF) |

## MEMORANDUM OF LAW

## INTRODUCTION

Andrew J. Pulkrabek ("Pulkrabek") submits this Memorandum in support of his objection to the confirmation of the Debtor's Modified Plan. Pulkrabek incorporates the facts stated in his Verified Objection, including the terms defined therein. The Court should deny confirmation of the Debtor's Plan for the reasons stated herein.

## ARGUMENT

### 1. The Debtor's Plan Should not be Confirmed Because It Fails to Apply the Income of the Non-Filing Spouse

The Debtor's Plan should not be confirmed because the Debtor fails to account for and apply the income of her non-filing spouse. [ECF 1]. By intentionally excluding this income from the Plan, neither the Plan—nor more generally this case—was filed in good faith. The Debtor's non-filing spouse, Gregory Clark, is illegally residing at the leased premises.[1]

---

[1] Pulkrabek's prior objection [ECF 16] mistakenly identified Ms. Jalen Marie Burns as the Debtor's spouse. Jalen Marie Burns is the Debtor's adult daughter, and a cotenant under the lease agreement. The Debtor's husband is Gregory Clark. Mr. Clark is not a party to the lease agreement. Mr. Clark's residence at the leased premises is a material violation of the lease agreement.

**Exhibit A**. As a resident (albeit unpermitted) at the premises leased by the Debtor, Mr. Clark

benefits from the bankruptcy stay under 11 U.S.C. § 362(a). Despite this, the Debtor's

Schedule H falsely states that the Debtor has no codebtors. [ECF 1, page 25]. In contrast to

this representation, the Debtor not only has a legally obligated cotenant, but her Official Form

122C-1 indicates the she has a "non-filing spouse" with a monthly income almost three times

the her income ($5,638.78 for Burns, $2,196.44 for Debtor = total household income of

$7,835.22). [ECF 1, p. 42].

Eligibility under Chapter 13 begins with 11 U.S.C. § 109(e), which provides that

"[o]nly an individual with regular income . . . may be a debtor under chapter 13 of this title."

"The test for regular income is not the type or source of income, but rather its regularity and

stability." *See In re Sigfrid*, 161 B.R. 220, 221 (Bankr.D.Minn.1993) (citations omitted). As

Judge O'Brien noted in *Bottelberghe*, "[t]he cases that have addressed the subject of

nondebtor spouse contributions to the income of the debtor spouse overwhelmingly agree

that, assuming the required evidence of regularity and stability is provided, such contributions

constitute income of the debtor for purposes of the debtor's Chapter 13 eligibility." *In Re

Bottelberghe*, 253 B.R. 256, 258 (2000) (citations omitted). Accordingly, the Court should

not permit the artifice of a lower-income spouse's filing, insulating a higher-income non-

filing spouse with the codebtor stay if the Debtor's Plan intentionally excludes the non-filing

spouse's income.

Under 11 U.S.C. § 1325(a)(3) and (7), conditions of confirmation are that the Debtor

demonstrate "the plan has been proposed in good faith" and "the action of the debtor in filing

the petition was in good faith." The Court judges each case on its own facts, considering all

the circumstances of the case. *In re Estus*, 695 F.2d 311, 316 (8th Cir. 1982); *see also In re LeMaire*, 898 F.2d at 1349 (reaffirming the applicability of the *Estus's* totality-of-circumstances analysis); *Noreen v. Slattengren*, 974 F.2d 75, 76 (8th Cir. 1992).

A freestanding indicator of bad faith is when the Debtor "has unfairly manipulated the Bankruptcy Code." *Educ. Assistance Corp. v. Zellner*, 827 F.2d 1222, 1227 (8th Cir. 1987); *see also In re LeMaire*, 898 F.2d 1346, 1349 (8th Cir. 1990); *In re Nielsen*, 211 B.R. 19, 22 (B.A.P. 8th Cir. 1997). Here, the Debtor has unfairly manipulated the Code to protect the significantly higher income of the non-filing spouse. Accordingly, the Plan may not be confirmed because it fails to comply with 11 U.S.C. § 1325(a)(3), and (7).

**2. The Debtor's Plan Should not be Confirmed because it Assumes the Lease without Curing All Defaults.**

The Debtor's Plan should not be confirmed because it provides for assuming the Pulkrabek lease without curing nonmonetary defaults. In Chapter 13 proceedings, Section 1322(b)(7) permits debtors to assume, reject, or assign unexpired leases "subject to section 365." 11 U.S.C. § 365(b)(1), in turn, provides in part:

> (1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee—
>
> > (A) *cures, or provides adequate assurance that the trustee will promptly cure, such default* …;
> >
> > (B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

(C) provides adequate assurance of future performance
under such contract or lease.

Non-monetary defaults are equally subject to the cure provisions found at 11 U.S.C. §

365(b)(1)(A). *See In Matter of Gretter Autoland*, Inc., 2015 WL 4915802 (S.D. Iowa) (citing

*In re Claremont Acquisition Corp.*, 113 F.3d 1029, 1034 (9th Cir. 1997); *In re Empire*

*Equities Capital Corp.*, 405 B.R. 687, 691 (Bankr. S.D.N.Y. 2009). While there is a paucity

of caselaw, it appears Courts addressing if § 365 permits the cure of non-monetary residential

lease defaults generally find § 365 applies both to monetary and non-monetary defaults. *See,*

*e.g., In re Gilmore*, 261 B.R. 175, 180-81 (Bankr. W.D. Pa. 2001) (agreeing that certain non-

monetary breaches can be cured); *In re Whitsett*, 163 B.R. 752, 753-55 (Bankr. E.D. Pa. 1994)

(finding that non-material, non-monetary breaches of a residential lease do not preclude

assumption pursuant to § 365); *In re Yardley*, 77 B.R. 643, 645 (Bankr. M.D. Tenn. 1987)

("It is implicit in the structure of § 365 that Congress contemplated the curing of non-

monetary defaults."); *see also In re Claremont, supra,* (stating that all defaults, both monetary

and non-monetary, must be cured before a lease can be assumed under § 365).

Here, the Debtor's attempt to assume the residential lease agreement but not comply with

all its terms is simply—quoting the Court in *Gretter*—the Debtor's attempt to eat her cake

and have it too. The Debtor cannot assume the lease without complying with the lease. "As a

general principle, assumption or rejection by a debtor in possession or a trustee is an

assumption or rejection of *the entire executory contract*. The Bankruptcy Code does not

specifically allow for selective assumption or rejection." In re STEAKS TO GO, INC., 226

B.R. 35, 38 (Bankr. E.D. Mo. 1998) (emphasis added). The assumption of an executory

contract is "cum onere" which allows the benefits of the contract to continue, but also imposes the obligation of performance under the contract terms. *Lewis Brothers Bakeries, Inc. v. Interstate Brands, Corp.* (*In re Interstate Bakeries Corp.*), 751 F.3d 955, 961 (8th Cir. 2014).

### 3. The Debtor's Plan Should not be Confirmed Because it Fails to Cure the Pre-petition Arrearages Due within a Reasonable Period of Time.

#### A. Cure Beyond the Lease Term is not Permitted

The Debtor's Plan should not be confirmed because it fails to provide for the cure of the default within a "reasonable time." Under the present Plan, the Debtor will pay the Chapter 13 Trustee $165.00 per month, which after a nine percent (9%) trustee's fee will yield approximately $150.00 for the plan payments. Assuming the IRS does not file a claim (ECF 13, p. 4, Part 16.1), the Debtor apparently intends to apply all payments to cure the rental arrears. Before the application of any interest rate or late charges, doing so will require all 60 months of payments ($8,962.80 cure amount / $150.00 payments = 59.75 monthly payments), lasting until August 2027. But the Debtor's lease expires in May 2024, subject to optional renewals at higher rental rates. **Exhibit A**. Stated differently, the Debtor's plan proposes to cure the lease defaults over a period that is roughly thirty-six (36) months longer than the existing lease itself.

A plan that proposes to cure lease defaults over a term that is longer than the lease itself does not cure the defaults within a "reasonable time" and therefore cannot be confirmed. A cure period greatly exceeding a lease term is not prompt. *In re Citrus Tower Blvd. Imaging Ctr., LLC*, No. 11-70284-MGD, 2012 WL 1820814, at *4 (Bankr. N.D. Ga. Apr. 2, 2012); *In re PRK Enterprises, Inc.*, 235 B.R. 597, 601 (Bankr. E.D. Tex. 1999), and cases cited therein.

Section 1325(a)(1) requires that a debtor's plan comply with all the provisions of Chapter 13. Section 1322(b)(5) requires the curing of any default within a reasonable time. Here, because the debtor's plan does not cure the prepetition delinquency within a reasonable time, the plan does not comply with Section 1322(b)(5). Accordingly, the Plan may not be confirmed. 11 U.S.C. § 1325(a)(1); 11 U.S.C. § 365(b)(1)(A), § 1322(b)(5).

**B.  No Cure Payment for 20 Months is not Permitted.**

Additionally, the Debtor proposes not to make any cure payment, of any amount, to Pulkrabek until month twenty (20) of the Plan. [ECF 21]. Or, put another way, under the Debtor's Plan, she proposes to continue to remain in the leased premises, not cure the multiple nonmonetary defaults, and make no cure payment of any amount to Pulkrabek until almost two full years into the Plan. *Id.* Rather, the first twenty months of payments go exclusively to Debtor's counsel. *Id.*

The Debtor's Plan further proposes the "pie in the sky" aspect of paying the majority of the cure amount through two (2) anticipated tax returns, which have not been assigned to the Trustee. First and foremost, if the Debtor expects to receive $10,000.00 in withheld taxes, the Debtor should modify her withholding to reduce the tax burden and propose a more realistic plan that pays these amounts throughout the year. Secondly, and at a minimum, the Debtor and any other co-filers should assign these tax refunds to the Trustee's office; and also guarantee a minimum plan payment in the event the tax refunds are not received.

Furthermore, the Debtor's Plan also fails the promptness test because (as noted above) the non-filing codebtor, and the Debtor's non-filing spouse, will both enjoy a five-year

codebtor stay without ever making their own filing, nor committing any of their income or
assets to the Plan. The Debtor cannot demonstrate promptness without demonstrating that the
cure proposal represents the best efforts of both cotenants.

### 4. The Debtor's Plan Should not be Confirmed Because it Fails to Provide Adequate Assurance of Cure.

The Debtor's Plan should not be confirmed because the Debtor is unlikely to make all
the Plan payments, and the Plan fails to provide adequate assurance of cure. The Debtor's
bottom-line available cash is the $165.00 the Debtor is committing to the Plan. (ECF 13, p. 2,
Part 2; ECF 1, p. 29 (Schedule J, item 23c)). But the Debtor can provide no assurance they
can sustain these payments over 60 months—in addition to current rent payments, plus
whatever IRS obligations the Debtor may face. Rather, the Debtor candidly discloses an
expected increase in expenses. (ECF 1, p. 30, item 24).

Given these facts, like the contracting debtor in *In re Deppe*, 110 B.R. 898, 904 (Bankr.
D. Minn. 1990), the Debtor "simply cannot overcome [the] historical fact[s]." The Debtor's
monthly rent obligation is $2850.00 per month and by her own account, she ran up a
prepetition delinquency of nearly $9,000.00 on a lease that was less than four months old; has
repeatedly failed to pay postpetition rent timely, is failing to cure multiple nonmonetary lease
defaults. Under these facts, the Plan may not be confirmed because it fails to comply with 11
U.S.C. § 1325(a)(1), (6), and (7).

### CONCLUSION

Based on the foregoing, Pulkrabek respectfully requests that the Court deny
confirmation.

Respectfully submitted,

**WARNER LAW, LLC**

Dated: November 16, 2022

*/e/ George E. Warner, Jr.*
George E. Warner, Jr. (#0222719)
120 South Sixth Street, Suite 1515
Minneapolis, Minnesota 55402-1817
Telephone (952) 922-7700

*Attorneys for Andrew J. Pulkrabek*

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| In Re:<br><br>Erin Marie Clark,<br><br>Debtor. | Chapter 13<br>Case No. 22-31273 (WJF) |

## UNSWORN CERTIFICATE OF SERVICE

I declare under penalty of perjury that on November 17, 2022, I served copies of the attached Notice of Hearing and Objection to Confirmation of Plan, Memorandum of Law, Unsworn Certificate of Service, and Proposed Order via ECF and, additionally, to the following parties via U.S. mail, postage prepaid:

Erin Marie Clark
1500 Circle Drive
Burnsville, MN 55337

Jalen Burns
1500 Circle Drive
Burnsville, MN 55337

Gregory A. Burrell, Chapter 13 Trustee
100 South Fifth Street, Suite 480
Minneapolis, MN 55402

Wesley W. Scott, Esq.
LifeBack Law Firm, P.A.
13 Seventh Avenue South
Saint Cloud, MN 56301

Dated: October 19, 2022                    */s/ George E. Warner, Jr.*

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| In Re:<br><br>Erin Marie Clark,<br><br>          Debtor. | Chapter 13<br>Case No. 22-31273 (WJF) |

## ORDER

The above-entitled matter came on for hearing on the Debtor's Motion under 11 U.S.C. § 1322 on November 22, 2022, at the U.S. Bankruptcy Court, Saint Paul, Minnesota.

Appearances were as noted on the record.

Based upon the evidence adduced at the hearing, the arguments of counsel, and the Court being fully advised of the premises,

IT IS HEREBY ORDERED:

Confirmation of the Debtor's Chapter 13 plan is denied.

Dated: _____

                                   _____
                                   William J. Fisher
                                 United States Bankruptcy Judge