UNITED STATES BANKRUPTCY COURT

DISTRICT OF MINNESOTA

---

In re:

  Erin Marie Clark                                                        Chapter 13

  Debtor.                                                                BK 22-31273

---

LIFEBACK LAW FIRM'S RESPONSE TO UNITED STATES TRUSTEE'S (UST)

OBJECTION TO APPLICATION FOR COMPENSATION AND REQUEST FOR ATTORNEY FEES

---

## **INTRODUCTION**

The court should know Erin Clark has not waived her attorney client privilege; However, Jalen Burns has waived her attorney client privilege. This is an important detail as it limits what LifeBack can use to defend itself despite having valuable communications which LifeBack believes would be crucial in defending itself, but not able to use.

Hindsight is 20/20.

This is the story of a firm who believed a mother was protecting her daughter and daughter was telling the truth to the firm. Neither of these reasonable beliefs turned out to be true.

This is the story of 2 debtors who cannot seem to tell the truth (based in part on the ruling from another court mom forged daughter's signature not once but twice) and a landlord who was the most aggressive landlord LifeBack has ever dealt with. The UST brings an Objection to Application For Compensation against LifeBack, who UST believes, should have known debtors were not truthful and landlord was overly aggressive. UST's Objection is sloppy, legally incoherent, specious, omits critical facts necessary for this court's consideration and warrants attorney's fees to be awarded to LifeBack.

Around April 24, 2022, Erin Clark (mother) and Jalen Burns (daughter) signed a lease with Andrew Pulkrabek to lease a dwelling located at 1500 Circle Drive, Burnsville, MN 55337. **(See Attached Exhibit A).** The lease called for monthly rent of $2,850.00 and the lease commenced on April 24, 2022 and ended on May 1, 2024. **(See Exhibit A, paragraph 1 and 2).**

1

Paragraph 25 and 26 of the lease spelled out defaults and the tenant's responsibility to pay all landlord's attorney's fees in an action to enforce the lease terms:

> 25. **DEFAULT.** If Tenant shall fail to pay Total Rent when due or fail to perform any terms hereof (hereafter a "Default"), after not less than seven (7) days written notice of such Default given in a manner required by law, the Manager, at his option, may terminate all rights of the Tenant herein. If Tenant abandons or vacates the premises while in default, after legal process, Manager may consider any property left on the Premises to be abandoned and may dispose of the same in any manner allowed by law. If the lease is canceled or Total Rent or Additional Rent is not paid on time, or Tenant vacates the Premises, Manager may, in addition to other remedies, use eviction or other lawsuit method to take back the Premises. If the Lease is ended and Manager lawfully takes back the Premises, Total Rent and Additional Rent for the unexpired term becomes due and payable. Manager may at that point re-rent the Premises for any term. Manager is not obligated to rent the Premises under the same terms hereof. However, Tenant shall continue to be responsible for Total Rent, expenses, damages, and losses, in addition to the Manager's cost of repairs, decorations, broker's fees, attorneys' fees, advertising, and preparation for renting. Any rent received from the re-renting shall be applied to the reduction of money the Tenant owes. After a Default, Tenant shall be responsible for Manager's full cost of re-renting. Tenant agrees to waive rights to trial by jury in any matter which comes up between the parties under or because of this Lease. Manager has taken no action that would result in the Lease being subject to any right of set-off, abatement, counterclaim, or defense.
>
> 26. **ATTORNEYS FEES**. In any legal action to enforce the terms hereof or relating to the premises, regardless of the outcome, the Manager shall be entitled to all costs incurred in connection with such action, including reasonable attorney's fees. Tenant acknowledges all attorney's fees shall be classified and billed to Tenant as Added Rent. **(See Attached Exhibit A, paragraph 25 and 26)**.

Subsequent to execution of the lease, landlord claimed Ms. Burns and Ms. Clark were delinquent on their rent and commenced an eviction proceeding in Dakota County District Court. The case caption was "Andrew J. Pulkrabek vs. Erin Marie Clark, Jalen Marie Burns" and the case number is 19HA-CV-22-2298. **(See Attached Exhibit B)**. A hearing was held on August 3, 2022 wherein Ms. Burns and Ms. Clark denied the allegations in the complaint and the court set the matter on for court trial on August 26, 2022. **(See Attached Exhibit B).**

On August 8, 2022, Ms. Clark scheduled a bankruptcy consultation with a LifeBack attorney. Because Ms. Clark had previously filed a Chapter 7 Bankruptcy on October 20, 2017 (17-43177), and because Ms. Clark desired to remain in the dwelling and cure her lease arrears, Ms. Clark was given legal advice to consider filing a Chapter 13 Bankruptcy. At the time of the consultation, Ms. Clark was living with her 4 children (including Ms. Burns and a disabled child) and her significant other.

2

On August 10, 2022, Ms. Clark signed a retainer agreement with LifeBack to represent her in a Chapter 13 Bankruptcy. (See Attached Exhibit C). Among other terms, Ms. Clark agreed to be charged $400.00 per hour for each hour a partner worked on her file. (See Attached Exhibit C, page 4).

## **ERIN MARIE CLARK'S CHAPTER 13 BANKRUPTY AND SENSELESS LITIGATION BY LANDLORD**

Ms. Clark's Chapter 13 Bankruptcy was commenced on August 10, 2022. Her Chapter 13 Bankruptcy case number is 22-31273. Ms. Clark's Chapter 13 filing was intended to stop the eviction proceeding against herself and her daughter in Dakota County, and cure any arrears over time.

In other words, Ms. Clark's Chapter 13 Bankruptcy was a routine Chapter 13 Bankruptcy. The confirmation hearing on Ms. Clark's Chapter 13 Bankruptcy plan was initially set for October 27, 2022. **(See Attached Exhibit D)**. Landlord objected to debtor's plan on October 20, 2022. **(See Attached Exhibit E)**.

For some reason, unknown to debtor and debtor's attorney, landlord refused to come to an agreement resolving the objection under simple and commonly used terms which would have given landlord drop dead language and would have required debtor to remain current on her Chapter 13 Bankruptcy payment and post Chapter 13 filing rent or landlord could obtain ex-parte relief from stay and proceed with eviction. To this day, this refusal is a head scratcher and in LifeBack's opinion, an example of poor lawyering.

Instead, landlord proceeded to break the lease terms, view into debtor's windows at night, and commence a litigation campaign against Ms. Clark, Ms. Burns, and their family that resulted in specious filings for Emergency Motions For Relief (which the court denied and warned Landlord his conduct was out of line) and landlord's refusal to agree to post-pone an evidentiary hearing even though debtor's disabled child had emergency brain surgery.

The court is well aware of Landlord's bad conduct in this case and LifeBack does not need to say anything additional about this. Landlord's bad conduct required debtor to incur legal fees that were incurred solely due to landlord's bad conduct. LifeBack was forced to file a motion requesting a continuance of the evidentiary hearing and contest an emergency motion for relief the court found to be a violation of the Bankruptcy Code and Local Rules.

At all times, it was Ms. Clark's wish to protect her family, including her daughter Ms. Burns from an aggressive landlord. Ms. Clark believed the property was great for her family because, in part, the property offered easy ingress and egress for their disabled child. Plan A involved coming to an agreement which would keep the family in the home and protect Ms. Burns at the same time. Plan B involved protecting Ms. Burns from landlord by filing a Chapter 7 Bankruptcy which was meant to protect Ms. Burns and keep Ms. Burns in the family home

long enough to have time to find other suitable housing for the entire family. Ms. Burns knew of plan A and B.

On January 2, 2023, a fully executed stipulation was filed in Ms. Clark's case which memorialized the party's agreement to resolve the objection to plan, relief from stay, and rejection of lease. On January 12, 2023, Landlord filed a notice of default and request for immediate relief from stay. (See Attached Exhibit F).

LifeBack believes Ms. Clark and her family resided on the premises until sometime in March, 2023. Ms. Clark, and her family lived on the property, despite being purportedly in default, from August 2022, until March, 2023.

Subsequent to LifeBack's withdrawal from Ms. Clark's Chapter 13 Bankruptcy case, the court dismissed Ms. Clark's Chapter 13 Bankruptcy case along with a 2 year ban from filing another bankruptcy case. Ironically, had landlord not chosen to perniciously litigate everything, landlord would have had relief from stay much sooner than he otherwise did. Why it was necessary by landlord to engage in protracted litigation instead of agree to drop dead terms is a caution for any plaintiff and their lawyers. In the end, only the lawyers win. But the legal fees incurred by landlord to which the lease required Ms. Clark and Ms. Burns to pay were growing rapidly.

It was against this backdrop that Ms. Burns decided in early January 2023 she needed to file Chapter 7 Bankruptcy.

## THIS COURT'S AUTHORITY TO AWARD CHAPTER 13 FEES

UST spends a lot of time on whether this Court has the authority to award Chapter 13 attorney fees, incurred during the course of the Chapter 13 Case, after the Chapter 13 case was dismissed. Ultimately, UST concedes, as it must, this court retains ancillary jurisdiction to award Chapter 13 attorney fees incurred during the Chapter 13 Bankruptcy case once the case is dismissed.

LifeBack would also argue this court has the authority to award Chapter 13 attorney fees incurred during the Chapter 13 case post dismissal under Section 105(a) of the Bankruptcy Code.

## UST'S OBJECTION IS SLOPPY, HASTILY PREPARED, AND NOT REVIEWED FOR MISTAKES

UST's objection was obviously put together hastily and without a cursory review of the facts in this case. For instance, UST's objection doesn't even get the case caption right in the

4

instant case, referring to Erin Clark's bankruptcy case as a Chapter 7 Bankruptcy when Erin Clark filed a Chapter 13 Bankruptcy. **(See page 1 of UST's Objection)**.

    Later on page 7 of UST's hasty objection, the UST refers to Erin Clark as Ms. Scott not once but twice. (See page 7 of UST's Objection). Finally, there are many instances where incorrect personal pronouns are used.

    UST's Objection should be overruled based on its sloppy objection alone.

## UST'S OBJECTION TO APPLICATION OF FEES

A) **Given Ms. Clark's limited disposable income and inability or unwillingness to pay rent, it should have been apparent that the extensive litigation over the motion for relief was futile and merely drove up the costs for the landlord and debtor.**

1) UST's position is in direction violation of Minnesota Local Bankruptcy Rule 9010-(g)(4) which specifically states:

> (4) *Effect of Failure to Comply*. Until a substitution of attorneys is filed or an order is entered allowing the original attorney to withdraw, the original attorney is the client's attorney of record and the original attorney **shall represent the attorney's client in bringing an defending all matters or proceedings in the bankruptcy case…..**Failure to receive advance payment or guarantee of attorney fees is not grounds for failure to comply with this subsection. (Emphasis added).

    UST's position is LifeBack should have known landlord would be litigious and unreasonable and LifeBack should have halted any work on debtor's Chapter 13 Bankruptcy because, according to the UST, debtor was the one who was unreasonable or unwilling to pay her rent and therefore LifeBack would have been justified in not defending or protecting Ms. Clark in her Chapter 13 Bankruptcy case. This argument is absurd and frivolous.

    Local Rule 9010-(g)(4) is not permissive. Local Rule 9010-(g)(4) is mandatory. LifeBack Law was required to bring and defend ALL matters or proceedings in Ms. Clark's Chapter 13 Bankruptcy case regardless of payment of fees as the Local Rule states. For the UST to argue LifeBack should be denied fees because it should not have done the work is against existing law.

UST's position is against existing law (which it uses against debtor's counsel frequently) with no suggested argument to change existing law. In other words, UST's position is simply brought to harass LifeBack Law Firm and is frivolous.

Moreover, LifeBack Law Firm is governed by 4 core values. LifeBack Law Firm lawyers and staff must be 1) kind and 2) helpful, 3) professional, and 4) deliver exceptional customer service. At LifeBack, we don't just meet the minimum bar set by Local Rule 9010-(g)(4), we exceed the rule exponentially.

Protecting debtors from overly aggressive landlords like the one in this case is what LifeBack Lawyers do. This is also the reason why LifeBack Law Firm is Minnesota highest Google reviewed bankruptcy law firm.

For the UST to take a position we should not have done all of the work we did for Ms. Clark and her family including a disabled child, is a clear directive to violate Local Rule 9010-(g)(4) and our core values. Would it have been kind, helpful, professional, or exceptional customer service to agree to take Mc. Clark's Chapter 13 case and then decline to bring and defend all matters within the bankruptcy case as UST now suggest we should have? Of course not. LifeBack Law Firm declines UST's offer to violate Local Rule 9010-(g)(4) and our core values.

LifeBack Law Firm also views the Minnesota Lawyer's Professional Responsibility Rules as a low bar and our conduct is much higher than the rules set.

2) <u>UST is wrong on the facts</u>:

   a) <u>Ms. Clark's Chapter 13 Bankruptcy didn't benefit Ms. Clark</u>.

It is hard to get a lecture from the UST on benefits to Ms. Clark after reviewing the final report on Denny Hecker's case wherein gross receipts of $9,436,081.15 were brought into the estate and after attorney fees, administrative costs, professionals, and priority claims were paid, a whopping $2,903.78 remained to unsecured creditors. **(See Notice of Amended Trustee's Final Report And Applications For Compensation And Deadline To Object mailed on 9-8-22 in case number 09-50779)** to which the UST signed off on;

In addition, LifeBack has witnessed numerous Trustee and Trustee attorney fee applications get the stamp of approval from the UST's office wherein trustee's and trustee's attorney's fees consume most of the estate despite very limited distribution to creditors.

If there is a different set of rules for trustees and trustee's attorneys than there are for debtor's attorneys, LifeBack would like to know.

b) Here, by contrast, debtor signed a retainer agreement with LifeBack, filed a Chapter 13 Bankruptcy which required LifeBack to bring and defend all matters within the bankruptcy case;

c) Against a landlord who was allegedly violating the lease by amongst other things staring into debtors windows at night frightening her children;

d) Debtor was able to live on the property from August 2022 to March 2023;

e) Debtor's children and significant other were able to live on the property during the same time period;

f) Debtor received the benefit of a law firm who was working days, nights, and weekends on her case;

g) Unlike Hecker where UST endorsed a distribution of nearly 100% to attorney fees, costs, professional fees and priority debts and unsecured creditors nearly nothing, here, debtor's initial plan proposed to cure her lease arrears and pay her unsecured creditors nearly 11% of their claims;

h) Debtor's last proposed plan proposed to pay 100% of debtor's creditors in full.

i) But for debtor's conduct, she could have successfully had a plan confirmed wherein the lease was rejected and payments made back to creditors. It was not LifeBack's conduct that got Ms. Clark's case dismissed and a ban from filing for two years, it was Ms. Clark's conduct.

B) **Next, UST claims LifeBack failed to expressly secure Ms. Burn's permission to send documents requiring her e-signature to her mother's email address for the stipulation filed in Ms. Clark's case on January 2, 2023 resolving an objection, motion for relief, and rejection of lease.**

### PRE-FIGHT BETWEEN MOTHER AND DAUGHTER

After Ms. Burns emailed LifeBack on February 1, 2023 and indicated she had not given authority for her Chapter 7 Bankruptcy case to be filed, LifeBack learned for the first time there was a fight that occurred between mother and daughter; more on this later.

However, at the time this stipulation between Ms. Burns, Ms. Clark, and landlord was being discussed at the end of December 2022 and beginning of January 2023, Ms.

7

Burns and Ms. Clark (mother and daughter) were living in the same home and communicating frequently about landlord and the stipulation terms with landlord.

It is important to remember with a legal bill of over 16k the communications between LifeBack and Ms. Clark and her daughter over many months was robust (as it should be).

Many phone conversations took place during this time where mother was on the phone with LifeBack and also discussing the case with Ms. Burns who was nearby Ms. Clark at home. It was during one of these communications Ms. Burns indicated an interest in filing Chapter 7 Bankruptcy if the stipulation fails.

UST states "Mr. Scott testified that he assumed that Ms. Burns signed the document, that he had no direct knowledge whether she signed the document, and that he had no recollection of talking to Mr. Burns about the stipulation." UST is grasping at straws.

First, how does an attorney really know a person on the other end of an e-signature is really the person who is the one authorized to sign it? You don't. If someone is intent on committing a crime, they will commit the crime regardless of how many safety protocols you put in place. It's like a home where you take reasonable safety precautions like locking your doors and windows and maybe installing lights and cameras; in the end, if someone really wants to break into your house and commit a crime they can do so.

Here, LifeBack was dealing with what it always believed was a loving mother/ daughter relationship where mother was looking out for her daughter and daughter was involved. UST's ad hoc we should have known innuendo is bunk. Here, mother was always concerned about daughter and daughter was involved in the proceedings.

In addition, LifeBack deals with clients all the time that share a single email address or allow a family member (such as an elderly family member) to use their child's email address as a vehicle to sign their bankruptcy schedules. Here, a mother and daughter sharing an email address to conduct business is not unusual.

Second, UST's use of Mr. Scott's testimony as definitive proof Mr. Scott did not get express authority from Ms. Burns to send the stipulation to her mother's address is misplaced.

The testimony is Mr. Scott had no recollection, not that these communications did not occur. For instance, how it came to be that LifeBack would send the stipulation and signature pages for Ms. Burns to Ms. Clark's email address had to have been discussed, LifeBack just does not remember the specific conversation. Those are two different things.

8

Third, the fact Ms. Clark has not waived her attorney client privilege hobbles LifeBack from protecting itself with valuable communications LifeBack has which would be useful to defend itself, but cannot ethically do so.

Fourth, the signature pages sent to Ms. Clark's email address contained an express written request for Ms. Burns's signature, not Ms. Clark's signature. The document attached to this response clearly shows it was Ms. Burns's signature and approval which was requested after she reviewed the document, not anyone else.

Fifth, at the time this stipulation was sent to Ms. Burns, LifeBack was not representing Ms. Burns. Ms. Burns was not yet a client of LifeBack on December 30, 2022. Ms. Burns would not become a client of LifeBack Law Firm until January 17, 2023.

C) **UST argues LifeBack failed to expressly obtain Ms. Burn's authority to send signature pages to file Chapter 7 Bankruptcy and sign a retainer agreement to Ms. Clark's email address.**

### POST FIGHT BETWEEN MOTHER AND DAUGHTER

UST's argument is highly suggestive of collusion between Ms. Clark and LifeBack to protect Ms. Clark to the detriment of Ms. Burns. As evidence of this purported collusion, UST points to an email LifeBack sent to Ms. Clark on January 16, 2023 wherein LifeBack suggest we now go to Plan B and have Ms. Burns file Chapter 7 Bankruptcy. UST points to this email as evidence of a plan to file bankruptcy for Ms. Burns without her purported knowledge to help Ms. Clark without daughter's apparent knowledge. Trouble is, the concocted story is not true.

UST also points to evidence showing Ms. Burns did not sign the Chapter 7 schedules or retainer as further evidence of what must be a scheme and collusion between Ms. Clark and LifeBack to protect Ms. Clark at the expense of Ms. Burns.

UST would have you believe Ms. Burns had never brought up the subject of filing bankruptcy and took no steps toward filing Chapter 7 Bankruptcy; that all steps taken were taken by another person or entity

UST's highly inflammatory accusations are belied by the facts in this case, a cursory review of which would have defused UST's inflammatory rhetoric had it wanted to do so.

First, around the time the stipulation was being discussed by Ms. Burns and Ms. Clark in a telephone call with LifeBack, Ms. Burns was asked directly about her own

9

liability and expressed an interest in discussing Chapter 7 Bankruptcy should the stipulation fail.

Second, when Ms. Clark was served a notice of default on the stipulation, and given Landlord's excessive litigation tactics, given Ms. Burns had a lawsuit pending against her in Dakota County on a lease where she agreed to pay landlord's costs and attorney's fees which we anticipated would be quite large due to the extent of excessive and unnecessary litigation by landlord and his attorney, and given Ms. Burns would be able to live in the property longer if she filed a bankruptcy, she scheduled a bankruptcy consultation with LifeBack on January 17, 2023. Ms. Burns not only scheduled that bankruptcy consultation, she attended it.

In that consult, Ms. Burns told us she resided at 1500 Circle Drive Burnsville, MN (the same address as her mother). LifeBack did not view our representation of both mother and daughter as a conflict because there was no conflict; both individuals looked to get rid of their liability on the same debt = no conflict. However, a conflict would arise later.

Third, during Ms. Burn's consultation with a LifeBack Law lawyer on January 17, 2023, Ms. Burns was told about bankruptcy options and non-bankruptcy options. After reviewing her options, Ms. Burns chose to file a Chapter 7 Bankruptcy and expressly indicated her desire to LifeBack. Ms. Burns chose to file Chapter 7 Bankruptcy; she was not ordered to do so.

Fourth, it was Ms. Burns who expressed a desire to file Chapter 7 Bankruptcy and who scheduled a review and sign appointment with LifeBack toward the end of January, 2023. Ms. Burns appeared for her review and sign appointment with LifeBack for the sole purpose of filing a Chapter 7 Bankruptcy for Ms. Burns.

Sometime on or before the review and sign appointment with Ms. Burns, LifeBack was told Ms. Burns lost her phone (which turned out to be false). When conducting the review and sign appointment with Ms. Burns, LifeBack apologized for her being in this situation (having signed a lease and dealing with such an aggressive landlord). During this meeting LifeBack also discussed Ms. Burns losing her phone and how we felt bad about that too.

At no time during this meeting did Ms. Burns volunteer the truth to LifeBack; The truth (as it would be later learned) is Ms. Burns and her mother had been in a serious fight, that Ms. Burn's mother purportedly threw and smashed Ms. Burn's phone intentionally and Ms. Burn's had moved out of mother's house prior to the review and sign appointment with LifeBack.

At the review and sign appointment, it was suggested, since Ms. Burn's phone was lost, LifeBack would send signature pages for Ms. Burn's Chapter 7 Bankruptcy schedules to Ms. Clark's email address along with the sign up documents. Ms. Burns agreed. As is normal in all LifeBack review and sign appointments, a date certain is

10

chosen to file the bankruptcy case giving clients time to review schedules and address missing documents or information. It also sets the expectations for LifeBack staff to know when a case needs to be filed and what is missing and must be obtained before filing.

When asked what her address was at Ms. Burn's review and sign appointment Ms. Burn's disclosed it was 1500 Circle Drive in Burnsville, MN 55337. Ms. Burns repeated this false information twice on her review and sign date as she is asked first my LifeBack staff and then again by a LifeBack lawyer. She lied both times knowing she had already moved out of the home but still gave LifeBack a false address. When asked about her phone numerous times, she continued the false narrative she "lost" her phone knowing the whole time what she was telling LifeBack was false.

When LifeBack did send the schedules, signature pages, and sign up documents to Ms. Burns via Ms. Clark's email address, as discussed and agreed at her review and sign appointment, and as had been done before, Ms. Burns never called LifeBack at any point to retract that express authorization, to tell the firm the truth, or to tell LifeBack she had changed her mind and had decided not to file bankruptcy. This is despite knowing the firm and she agreed on a very specific file date. Ms. Burns knew the schedules, signature pages, and sign up documents were going, as agreed, to her mother's email address, and she knew the date we planned to file the case, and never once called LifeBack to inform LifeBack she had changed her mind and had lied to the firm. If she didn't trust her mother, why didn't she tell LifeBack?

Instead, when LifeBack sent the schedules for approval, and sent signature pages for filing the Chapter 7 Bankruptcy and signature pages for the sign up documents to Ms. Clark's email address explicitly requesting that Ms. Burns review and sign the documents, and then they were signed by "Jalen Burns" LifeBack naturally concluded Ms. Burns reviewed and approved the schedules and signed the signature pages to file Chapter 7 Bankruptcy including the sign up documents. The documents sent to Ms. Clark's email requested the express written authorization of no one other than Ms. Burns as evidenced by the signature notating, Jalen Burns.

It was not until February 1, 2023 Ms. Burns contacted LifeBack to state she had not authorized her bankruptcy filing. **(See Attached Exhibit G)**. At that point the firm contacted the Minnesota Board of Professional Responsibility who advised the firm to withdraw on both cases; which we did.

Subsequent to February 1, 2023, LifeBack would learn what the purported truth is; Ms. Burns and Ms. Clark were in a major altercation where Ms. Clark purportedly smashed Ms. Burn's phone intentionally. It would be after February 1, 2023, LifeBack would learn another court had found Ms. Burn's signature had been forged by Ms. Clark, not once but at least twice.

LifeBack had no knowledge of any of these shenanigans. UST and anybody else can Monday morning quarterback whether Ms. Burns should have filed Chapter 7

11

Bankruptcy or not. Just because landlord made a purported sweetheart deal to settle with Ms. Burns means nothing. The reality is landlord likely made this sweetheart deal to spurn Ms. Clark and Mr. Scott who were engaged in a highly contested Chapter 13 Bankruptcy case.

Knowing what LifeBack knew and when it knew it, the legal recommendation to Ms. Burns to file Chapter 7 Bankruptcy was sound.

## **CONCLUSION**

Ms. Clark signed a legally binding contract with LifeBack Law Firm to represent her against an aggressive landlord. The Local Bankruptcy Rules required LifeBack to bring and defend all matters within her bankruptcy case. Ms. Clark approved of every legal action taken in her case by LifeBack knowing the size of her legal fees.

LifeBack Law Firm does not recall the UST's office fielding phone calls from a tearful client calling to tell us the landlord is looking in windows, or responding to unlawful emergency motions for relief, or responding to a landlord who refuses to postpone an evidentiary hearing due to debtor's disabled child's brain surgery. LifeBack Law Firm spoke to debtor at the hospital standing by her child numerous times, not the UST's office.

The fact UST's office brings Jalen Burn's case in Ms. Clark case wherein LifeBack Law Firm is seeking rightful compensation is done to simply harass and try to embarrass LifeBack Law Firm, a violation of Minnesota Rules of Professional Responsibility 4.4. After all, what on earth does Jalen Burn's Chapter 7 Bankruptcy case have to do with LifeBack Law Firm Application for Fees on Erin Clark's Chapter 13 case? There is no other purpose to bringing Jalen Burn's Chapter 7 Bankruptcy case into this application for compensation on an altogether different case other than to harass LifeBack Law Firm. This court should consider not countenancing such conduct.

The conflict of interest that arose in these cases arose squarely because of the conduct of both mother and daughter, not LifeBack Law Firm who was not in on the numerous lies pushed by both Ms. Burns and Ms. Clark. The very notion LifeBack caused this conflict is insulting and ridiculous.

UST now argues because mother and daughter's lies caused a conflict, LifeBack Law Firm should be punished and denied this court awarding LifeBack Law Firm the monies held by Chapter 13 trustee Greg Burrell's office totaling a mere $401.88 on Erin Clark's Chapter 13 case.

Ms. Burns was well aware of the issues with this landlord and knew about plan A, which was to try and protect Ms. Burns in the stipulation filed with the court bearing her

signature. While LifeBack testified it doesn't recall the communications with Ms. Burns about the stipulation and sending the stipulation for Ms. Burns to sign to her mother's email, the UST leaps ahead and says no express consent was given by Ms. Burns to have the stipulation send to mother's email address. In fact, there were hundreds and hundreds of communication made between LifeBack Law Firm, Ms. Clark and Ms. Burns. LifeBack Simply does not recall the specific communications concerning the stipulation or the signature of Ms. Burns being sent to Ms. Clark's email address.

LifeBack is hamstrung in this case because, while Ms. Burns waived her attorney client privilege, Ms. Clark has not. Information that would be useful to LifeBack cannot be shared because of the attorney client privilege with Ms. Clark.

LifeBack has no doubt Ms. Burns may have changed her mind and sympathize with Ms. Burns regarding the same, but Ms. Burns never rescinded the authorization to send all signature pages to her mom's email address to accomplish the Chapter 7 filing nor apprised the firm she had changed her mind about filing bankruptcy and never told the firm the truth about the purported fight between mom and her and that mom purportedly smashed her phone; and that Ms. Burns was no longer living in the home. None of this was told to LifeBack; we cannot read minds.

UST's position Mr. Scott created a conflict is absurd and untrue. Ms. Burns and Ms. Clark created the conflict of interest full stop. Prior to Ms. Burns email to LifeBack stating she did not give authorization to file her bankruptcy, where was the conflict? Mother was getting rid of her liability on the lease in her bankruptcy case and daughter would get rid of her liability on the lease with her own Chapter 7 bankruptcy;

The perversion of the UST's objection is on the one hand, UST states Ms. Clark forged her daughter's signature twice, and then on the other hand, wants to punish LifeBack for being tricked by both Ms. Clark and Ms. Burns thereby rewarding Ms. Clark, the purported forger. So the perversion of the objection rewards the purported forger by returning money to her that does not belong to her. Those fees were earned by LifeBack Law Firm under a retainer agreement Ms. Clark signed.

Ms. Clark was actively involved in her representation and knew the extent of litigation we were pursuing and the amount of fees she was incurring. She never once objected to the firm filing motions or defending motions to protect her interests, not once.

In short, Ms. Clark received the benefit of LifeBack's services. LifeBack simply seeks a court order awarding the monies held by trustee be awarded to LifeBack toward our fees. UST's objection should be overruled and attorney's fees awarded to LifeBack for having to respond to a sloppy, hastily prepared, legally incoherent objection.

13

Here, LifeBack Law looks for a court order simply awarding LifeBack Law Firm the monies held on hand by trustee, in this case $401.88. LifeBack Law Firm rejects UST's invitation to deny representation to bankruptcy debtors in violation of the Local Rules which require it.

LifeBack got caught in the middle of a fight between mother and daughter on the one hand; neither one of whom told LifeBack the truth (based on a subsequent court finding mom had forged daughter's signature) when it was critical to do so and an aggressive landlord bent on specious litigation on the other. Instead of holding those responsible for failing to tell the truth and commit forgeries the UST seeks to reward those individuals and punish LifeBack.

In yet more senseless litigation, it will cost several people more attorney fees only to find out what we already know; Ms. Burns and Ms. Clark have trouble telling the truth and landlord was ridiculously aggressive and LifeBack was caught in the middle. When all is said and done, this will remain the truth and people will have invested far too much time and money when we already know this to be so.

The court should consider overruling UST's Objection and ending yet more specious litigation that is unwarranted and a waste of judicial resources.

If the court orders an evidentiary hearing LifeBack plans to call Jalen Burns, Erin Clark, Amanda Rosback, Wesley Scott, Andrew Pulkrabek, and George Warner as witnesses.

Dated: July 26, 2023

LIFE BACK LAW FIRM, P.A.

/e/ WESLEY W. SCOTT #0264787

Attorney for Debtors

13 7th Avenue South

St. Cloud, MN 56301

(320) 252-0330

wes@lifebacklaw.com